Good morning and welcome to the Ninth Circuit. We are pleased to have Judge Bennett of the District of Maryland sitting with us for a few days. We will take the cases in the order they appear on the calendar. It's a fairly short calendar so we will not take a break. We will not keep time for the appellants but the appellants may reserve time and if you use your time I will probably give you a minute in rebuttal. Anyway, we will start with United in your honors, Katie Harlbrink on behalf of Mr. Luna. I'll try to keep an eye on my time and reserve two minutes for rebuttal. This court should vacate Mr. Luna's conviction because the prosecutor indirectly commented on his failure to testify at trial and that comment was not harmless beyond a reasonable doubt. Four times the prosecutor questioned Ms. Monroy about quote in-court interpretation. Four times the prosecutor stressed the quote benefits to in-court interpretation and over the course of three transcript pages the prosecutor contrasted those benefits with the difficulties of interpreting text and voice messages. Messages that the jury knew by that point lay at the heart of the case. So I'll start with this is what I don't understand. I mean I extremely attenuated for the following reason. The texts and calls were out-of-court information that was going to come in anyway whether he testified or not and if he testified he couldn't he might be able to explain what he said but that isn't what she was talking about. She was saying when somebody is testifying if I don't understand them I can ask them what they mean. The notion that somebody would testify about what he meant two years ago and that's what she was referring to seems completely I mean worse than speculative and no ordinary person would think that's what she was talking about. Your Honor, I disagree and that's because the prosecutor repeatedly contrasted the benefits to in-court interpretation where quote you can ask the speaker to clarify what they mean. When they're speaking so what what is the implication that he would have come and explained what he meant two years ago or what? Yes, Your Honor, that was the implication. The implication was that he could have cleared up the ambiguities that lay at the heart of his testimony. While he's testifying I could ask him what he means while he's testifying. Yes, Your Honor, but in the second part of her questions or the second part of the prosecutor's questions he stated that a downside, a detriment of text and voice messages is that you cannot ask the speaker or the writer what he or she meant or seek clarification from them and here for the text and voice messages Mr. Luna was the speaker or the writer and so that was where the the prosecutor's questions drew attention to the kind of evidence that was available at the trial. If he had stood up and testified she could have sought clarification from the speaker or the writer and that mattered in particular in the context of this case because the key issue in the case was whether these text messages conclusively proved knowledge beyond a reasonable doubt or whether they were instead ambiguous enough to allow for some alternative explanation. So by suggesting that Mr. Luna could provide this beneficial in-court testimony, this more was unwilling or was not going to be testifying on a key issue in the case. Ms. Hurlburn, if I can, really what this amounts to is there was a series of text and voice messages with two unidentified contacts on his cell phone identified as Junior and Pedro Junior and these messages were all in Spanish, correct? Correct. And essentially the three questions at issue here are would you agree that one benefit to providing in-court interpretation is to ask the speaker to clarify what the speaker means and then it was followed by in-court interpretation and trying to clarify what is meant in terms of code words or what have you and then there was one more question about what the intent was on the clarification. There was an objection that was overruled and the prosecutor dropped this entire line of inquiry and never returned to it again nor was there any reference in closing argument. Isn't that in the record? Isn't that correct? Your Honor, we are actually challenging four comments. So the benefits to providing in-court interpretation include that you can clarify what the speaker or writer meant as well as the formality in which you speak in the courtroom. That was the second comment. The third comment was comparing what you just described with in-court interpretation. Do you have the benefit of asking the speaker what he or she meant? And then the fourth comment is turning to the translations of written messages again comparing to in-court translation services. So what we're dealing with here is the ambit of Griffin v. California in terms of commenting upon a defendant's failure to take the stand and essentially it's pretty clear to me that the case law indicates that there has to be some implication that only the defendants could rebut. For example, prosecutors have used the phrase it's unrebutted, for example, in a context with only the defendant could rebut. Correct? That's the line of cases within Griffin v. California. Correct? The line of cases says that if an additional possible meaning creates ambiguity as to whether the prosecutor was referring to the defendant, then there is no implied comment on silence. But that's not what we have here. What you have here is you have text messages with two other people. And the case law, it seems pretty clear that when it's more than one person involved, that it isn't deemed to be a direct comment upon one person. It's not just that one person could provide any kind of information. All three participants in the conversation could provide clarification, could they not? If they were available. I disagree slightly with Your Honor's understanding of the case law. The case law says if additional reference, if additional persons involved create ambiguity as to whether the defendant is being referred to, that's when there's no implied comment on silence. But that's not what we have here. Because by the time these comments were brought up, the jury knew that the evidence at the heart of the government's case was this two-sided conversation between Mr. Luna and Pedro Jr. And so by the time that the prosecutor starts talking about text and voice messages and how hard it is to interpret them and how much easier it is to seek the clarifying benefits of in-court interpretation, the jury knows that the prosecutor is talking about this two-sided conversation, all of these messages. There would have been no rational way to understand those comments to just refer to the difficulties of interpreting Pedro Jr.'s messages. Well, then isn't the issue primarily then whether or not it necessarily draws attention to a defendant's silence if in fact another person, even one not present in court, could testify on the issue? Because my research has indicated that there's really no Ninth Circuit authority on this, but the Tenth, Seventh, and First Circuits have all dealt with this issue and have found that there's no Griffin v. California violation. Isn't that correct? Even in those cases, Your Honor, the point is that it creates ambiguity as to whether the prosecutor is referring to the defendant's silence. It's not about just the existence of other potential witnesses or the existence of other kinds of evidence that the prosecutor wasn't referring to, so the ability of, for example, Mark Owens to come in and provide evidence. The issue is that the prosecutor pointed to a specific lack of testimony, and that lack of testimony encompassed Mr. Luna's testimony. So I see I'm running short on time. Unless Your Honors have further questions right now, I'll reserve. Thank you very much. Thank you. Good morning, Your Honors. May it please the Court, Mark Rahe for the United States. Your Honors, the government submits that there was no indirect Griffin error here. What we are talking about are three or four questions, just over three pages of transcript, and a 600-page trial transcript, and they did not draw any or reflect any manifest intent to draw attention to the defendant's refusal to testify. But the intent doesn't matter, does it? Well, the word, the phrase is manifest intent. I know in the reply brief my defense counsel seems to indicate that I have kept it. Isn't the question what people would have understood? Yes, and if you look at our arguments under that manifest intent prong, every single one of them is objective. Well, I don't care, but you said manifest intent.  It's not a question of intent. It's a question of what people would have understood. Well, I'm just quoting your law, Your Honor. That's what Hovey v. Ayers, even at pages 12 through 13. I don't understand why you're going there. I mean, is it at all likely that any juror would have understood that this was a suggestion that he should have gotten up there and explained what he meant two years ago? No, Your Honor, and the government agrees. I mean, at most it's attenuated. The case law says it's not just enough that it might or it probably would draw attention. It naturally and necessarily has to. And for all the reasons that the court has already gone through in the opening presentation, that standard isn't met here. And, you know, I think the biggest thing, and I think Judge Bennett referred to it, in this area of law, and my research reflected the same thing, I think the whole point of a Griffin error is the suggestion that the defendant and only the defendant could somehow rebut a point or provide an answer to a question. Here, even as the defense frames the issue, you have a handful of text messages where a few words were in dispute. The defense, you know, the government, we called our expert, Ruth Monroy, the defense called their expert. All that evidence was put in front of the jury. The parties were free to argue with their contrary inferences. But the important thing is, is that where the defense thought there was ambiguity, they had an expert, a witness, who could provide that meaning. And, you know, another thing I just want to point out, I know defense counsel in our opening presentation characterized these statements as the heart of the government's case. And if there's one point I hope to make before I stand down here, is that that is not, in fact, true. Even if one were to assume an error here, it clearly was harmless. In excerpts of record 528 to 536, that contains the prosecutor's closing argument on the importation count. Not once in those eight pages are there references to any text messages. Instead, the prosecutor talks about the fact that the defendant was the driver, the sole occupant, and the registered owner of the car. The exclusive dominion and control. All of the, you know, four trips in the last ten days. The quantity of the drugs. This was astounding. 95 pounds of pure methamphetamine worth $80,000 wholesale. Excerpts of record 531 to 533, the prosecutor talks about the defense automotive expert and how much of his testimony actually supported the government's case. That expert testified that this car is impossible to hotwire. A regular locksmith can't duplicate the key. You could only access the compartments where the drugs were if you had internal access to the car. And then even towards the end of it, the prosecutor talks about the witnesses that the defense called. And even in rebuttal, 564 to 566, this is very important, the defendant's own cell phone had a picture of an area in the car behind which drugs were found. None of those pages is there a single mention of text messages. Instead, all the text messages come up, excerpt of record 536 to 544. And that was all in the context of the conspiracy count. Because Pedro and Pedro Jr. weren't arrested, they weren't charged, they weren't in court. No drugs were found in the other crossings. The only way to prove the agreement element of the conspiracy was to then use the text messages. And I bring all that up in conclusion because, as this court is well aware, the jury acquitted on the conspiracy count. So even an objective look at the record right there tells you that those text messages were not the heart of the government's case on the importation count. And, you know, with that, unless the court has any further questions, the government would submit, and I yield the remainder of my time to Ms. Hurlbrink. Questions? No questions. Okay, thank you. Yes. Thank you, Your Honors. So first I want to address the suggestion that the text and voice messages were not at the heart of the government's case for knowledge. That's just not true. On 3 ER 566, in rebuttal closing argument, the prosecutor stated that defense counsel wants to stand up here and talk about what wasn't done. What was done was the cell phone he had on him at the time of arrest was searched, and it contained significant evidence proving his knowledge. And the prosecutor brought up knowledge and related knowledge to those cell phone messages again and again and again in opening and closing arguments. So that's just not accurate. But there was no – there's no – in terms of the knowledge of the defendant, in terms of alternatively, even if there were a Griffin violation, Chapman v. California clearly stands to the proposition that reversal is only required under certain limited conditions, one of the three of which is that there's an inference of guilt from silence which is stressed to the jury as a basis for the conviction. The matter of the argument as to the knowledge of the defendant is not necessarily stressing his silence in any way. That's one factor in a multi-factor test, Your Honor. But Carruto tells us that an inference of guilt is stressed if the comment goes to a, quote, key issue or central question in the case. And as all these points show, the text messages and their ambiguities, whether they were ambiguous enough to allow for reasonable doubt or so clear that they proved knowledge beyond a reasonable doubt, was at the very center of the case. The defense lawyer in this case made the same point, didn't he, when he said, and when you're viewing messages without the opportunity to speak to the people who sent the messages, you can't clarify, when he was cross-examining her, right? He did, Your Honor, but only after his contemporaneous objection was overruled. So what? So he was faced with a situation where he had to remedy the damage, and so his approach was to try to shift the focus away from any failure of proof on Mr. Luna's part and towards potential problems with Ms. Monroy's testimony. There's no reason you had to say that. The reason he said it is because it was a point that went to the credibility of her interpretation or the accuracy of her interpretation that she didn't have the people in front of her, which is the same reason that it seems to me most people would have thought the prosecutor was raising it to begin with, just to demonstrate that there were limitations to what she was doing and give her more credibility in the sense that she was doing the best she could under the circumstances. Well, the prosecutor could have made all of those credibility-type points without ever talking about in-court interpretation or stressing its benefits. The prosecutor could have said that words have different meanings. Interpreters can disagree. Ambiguities can arise because of the lack of context. There's just no reason to then stress, to bring the entire exchange in terms of the benefits to in-court interpretation. Okay. Well, your time is up, and thank you very much. Thank both of you for your helpful arguments. The case of United States v. Luna Aquino is submitted.
judges: BERZON, BEA, Bennett